Filed 8/15/16  P. v. Francisco-Castro CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANTONIO FRANCISCO CASTRO et al.,<br><br>    Defendants and Appellants. | B262307<br><br>(Los Angeles County<br>Super. Ct. No. VA130990) |

    APPEAL from a judgment of the Superior Court of Los Angeles County, Raul A. Sahagun, Judge.  Affirmed in part, reversed in part, and modified.

    Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

    Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant Antonio Francisco Castro.

    Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Randy Daniel Ortiz.

_____

Appellants Antonio Francisco Castro and Randy Daniel Ortiz appeal from their convictions by jury verdict of first degree murder with findings that each personally used a deadly weapon in the commission of the crime and that it was gang related. They contend the court's failure to instruct the jury on the elements of the deadly weapon enhancement constitutes constitutional structural error requiring reversal. In the alternative, they argue that if subject to harmless error review, the error was not harmless. Castro also challenges the sufficiency of the evidence supporting the jury's finding that the crime was gang related. He also claims entitlement to 18 additional days of custody credit.

Ortiz challenges the admission of gang evidence which he contends exposed the jury to improper character evidence based on inadmissible hearsay. He argues the trial court's admonition was insufficient to cure the resulting prejudice thus depriving him of his due process right to a fair trial. He also contends the court erred by finding five prior prison term enhancements true. Each appellant joins in the contentions raised by the other. Both seek modification of the abstract of judgment and minute orders to reflect that restitution was ordered on a joint and several basis.

Respondent argues the instructional error was harmless, that substantial evidence supports the jury's finding that the offense was committed for the benefit of a criminal street gang, and that Ortiz's argument concerning the gang expert's testimony was forfeited as well as meritless in light of the trial court's curative admonition. Respondent also contends that imposition of five one-year enhancements for prior prison terms was proper as to Ortiz, and concedes that the appellants should be awarded additional days of presentence custody credit and that their abstracts of judgment should be corrected to reflect that the restitution award was imposed jointly and severally.

We conclude the court's error in failing to instruct the jury on the elements of the use of a deadly weapon enhancement was not harmless beyond a reasonable doubt as to Ortiz and reverse the enhancement as to him on that ground. We also conclude that this instruction was harmless error as to Castro. The jury was properly instructed that appellants' convictions of the present murder charge could be used as a predicate offense

2

to establish a pattern of gang activity for the gang enhancement under Penal Code section 186.22.[1] Ortiz forfeited his argument that a statement by the prosecution's gang expert could not be cured by the curative admonition given by the court. Even if the issue had been preserved, we conclude that the admonition was sufficient, and find no violation of Ortiz's rights to due process under the federal and state constitutions. We also conclude that the trial court properly imposed five one-year enhancements for Ortiz's prior prison terms. Castro is entitled to a total of 599 days of presentence custody credit, and the trial court is directed to amend the abstract of judgment to reflect that amount. In addition, the abstracts of judgment for both appellants are to be corrected to reflect that the trial court's restitution order is joint and several.

FACTUAL AND PROCEDURAL SUMMARY

On October 7, 2012, Shane Cook was found by his friend Charles Chatterton, beaten to death in his house in Bellflower. There was blood on the floor, walls, and ceiling of the kitchen where Cook was found.

Alicia Doolan testified under a grant of use immunity from the district attorney.[2] Doolan spent the day of the murder with Cook and Ortiz at Cook's house, smoking methamphetamine at times. At some point, Cook left the house, then returned 10 minutes later. Ortiz used Doolan's cell phone throughout the day. When Cook returned, he and Ortiz started arguing about an iPad. Doolan heard Ortiz make a telephone call in which he said "'Come and get me. I'm at the homie's pad.'" Ortiz was holding a piece of plumbing pipe.[3] There was a similar piece of pipe on the kitchen table. Doolan described the two pipes as about as long as the distance from her elbow to her fingers. She never

---

[1] All further statutory references are to the Penal Code unless otherwise indicated

[2] Doolan was relocated for her safety to Las Vegas by the Los Angeles County Sheriff's Office. She failed to appear pursuant to a subpoena and was in custody at the time of her trial testimony.

[3] Charles Chatterton testified that he unsuccessfully attempted to connect Cook's house to the city water supply the morning of the murder.

saw any other weapon. She heard Cook say, "'Come on dude. We don't need that. Why are you disrespecting?'" At that point, Ortiz put the pipe down on the kitchen table. A short bald man Doolan identified as Castro came to the house. When Castro arrived, Ortiz said "'Oh, the homies are here.'" Doolan recalled Cook saying "'Who is that? Now you got people coming to my house. Come on, man. That's not cool.'"

Castro asked Doolan to put her phone away and to excuse them so he and Ortiz could speak to Cook. She went to the bathroom, then heard arguing. When Doolan eventually came out of the bathroom she saw the men fighting in the kitchen and saw Cook fall to his knee. She returned to the bathroom. When she came out a few minutes later, Ortiz and Castro were in the kitchen. Cook was on the floor. Doolan could not recall whether he was moving. She saw blood. Ortiz told her to wait outside by Cook's car and handed her the car key. As Doolan walked to the kitchen door, she stepped on blood. Doolan got into the driver's seat.

Five to ten minutes later, Ortiz walked down the driveway and got into the front passenger seat of Cook's car. Castro followed a minute later and got into the rear passenger seat. Doolan did not recall either man carrying anything. She complied with Ortiz's demand that she drive. Ortiz asked Castro if Cook was still alive. Castro said, "'He was still breathing but I cracked him pretty hard.'" After driving for a short period of time Castro said he had left his phone at Cook's house. Doolan pulled the car over, got out, and told appellants she would wait for them. They drove off. Doolan walked away. She did not report what she had seen to the police.

Doolan identified Ortiz from a photographic array. From another array, she eliminated all photographs except one of Castro. Castro's photograph depicted him with hair. Doolan said that the man at Cook's house had been bald. After being shown another photograph of Castro, Doolan began sobbing and said that it was the man who had come into Cook's kitchen before the murder.

Emmanuel Chin testified that he went to Cook's home on the day of the murder. He knocked on the metal screen door. A man Chin did not know came to the doorway and said Cook was busy. Chin did not like associating with the people who visited

4

Cook's house, so he said he would come back later. Chin was shown a photographic lineup and told the police that a photograph of Ortiz looked most like the man who came to the door of Cook's house. At trial he testified that there was no one in the courtroom who looked like the man at the door. Margaret Fowler was at Cook's house on the day of the murder. She saw a woman there whom she later identified as Doolan. When interviewed by investigating officers, Fowler said she heard someone refer to a man who was in Cook's living room as "Boxer," which is Ortiz's gang moniker.

The medical examiner testified that Cook died from multiple blunt force trauma to the head. There were numerous injuries to his head, back, chest, and arms, including 14 separate head wounds. Some injuries were consistent with being caused by a long, hard instrument. Cook also had defensive wounds.

Ortiz's fingerprints were found on the window of an exterior door leading to the kitchen of Cook's house. His palm print was found on the kitchen counter. The plumbing pipes described by Doolan were never found. No other weapons were recovered. A forensic search of the scene did not reveal genetic material matching either appellant. When arrested, in late November 2012, Ortiz was wearing shoes matching shoes identified by witnesses as Air Jordan Nike shoes worn by Cook.

Appellants were charged with one count of murder with allegations that the crime was gang related and that each personally used a deadly weapon in the commission of the crime. (§§ 187, subd. (a), 186.22, subd. (b)(1)(C), 12022, subd. (b)(1).) The information alleged that Castro had one prior serious or violent conviction under the "Three Strikes" law (§§ 667, subds. (a)(1) & (b)-(i), 1170.12, subds. (a)-(d)). It alleged that Ortiz had one prior strike conviction and five prior convictions for which he had served prison terms.

The jury convicted each appellant of first degree murder and found true the allegations that the crime was gang related and that each appellant personally used a deadly weapon in the commission of the murder. The court denied Ortiz's motion for new trial. In bifurcated court trials, the court found the prior conviction allegations true. Ortiz was sentenced to the term of 25 years to life on the murder count, with an additional consecutive year for the use allegation. The court also imposed five one-year

enhancements under section 667.5, subdivision (b) for an additional five years. The court stayed the sentence for the gang enhancement. Ortiz's total sentence was 31 years to life.

Castro was sentenced to a term of 25 years to life for murder, doubled to 50 years to life under the Three Strikes law. He was sentenced to an additional consecutive term of five years for the prior prison term and an additional one year for personal use of a deadly weapon, for a total of 56 years to life.

Each appellant filed a timely appeal from his judgment of conviction. After the appeal was filed, counsel for Ortiz asked the trial court to correct the custody credits awarded. The trial court granted the request, awarded 591 days of custody credit, and directed the clerk to issue an amended abstract of judgment to the Department of Rehabilitation and Corrections. Ortiz then withdrew his appellate challenge to the custody credits on the ground of mootness. We granted Ortiz's motion to augment the record on appeal with the minute order and amended judgment. Counsel for Castro did not seek the same relief in the trial court.

DISCUSSION

I

The information alleged that each appellant personally used a deadly weapon in the commission of the murder (§ 12022, subd. (b)(1)). The jury found the enhancement true as to each, although the trial court failed to instruct the jury on the elements of the enhancement either orally or by written instruction. Appellants argue that this omission constitutes structural error of a federal constitutional dimension that demands reversal per se. Respondent concedes the error, but contends that it is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

"'The trial court has a sua sponte duty to give correct instructions on the basic principles of the law applicable to the case that are necessary to the jury's understanding of the case,' including the elements of a charged enhancement. [Citation.] '"An appellate court reviews the wording of a jury instruction de novo" [citation], and determines whether "the instructions are complete and correctly state the law" [Citation].' (*People v. Bell* (2009) 179 Cal.App.4th 428, 435.)" (*People v. Camino*

6

(2010) 188 Cal.App.4th 1359, 1380; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490.) "[A] trial court's failure to instruct the jury on an element of a sentence enhancement provision (other than one based on a prior conviction), is federal constitutional error if the provision 'increases the penalty for [the underlying] crime beyond the prescribed statutory maximum.' [Citation.] Such error is reversible under *Chapman, supra,* 386 U.S. at page 24, unless it can be shown 'beyond a reasonable doubt' that the error did not contribute to the jury's verdict." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326.) Appellants argue that the instructional error is structural and thus reversible per se, citing *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279-282; and *People v. Cummings* (1993) 4 Cal.4th 1233, 1315.

The pattern instruction on the enhancement for personal use of a deadly or dangerous weapon, CALCRIM No. 3145, would have instructed the jury on the definition of deadly or dangerous weapon and the requirements for finding a defendant personally used such a weapon: "A deadly [or dangerous] weapon is any object, instrument, or weapon that is inherently deadly [or dangerous] or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury. [¶] [In deciding whether an object is a deadly weapon, consider all the surrounding circumstances, including when and where the object was possessed[,] [and] [where the person who possessed the object was going], [and] [whether the object was changed from its standard form] [and any other evidence that indicates whether the object would be used for a dangerous, rather than a harmless, purpose.]] [¶] . . . . [¶] Someone *personally uses* a deadly [or dangerous] weapon if he or she intentionally does any of the following: [¶] [1] Displays the weapon in a menacing manner (./;) [¶] [OR] [¶] [2. Hits someone with the weapon(./;)] [¶] [OR [¶] (3/2). Fires the weapon.] [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved." (See *People v. Bland* (1995) 10 Cal.4th 991, 997.)

"An error is '"structural," and thus subject to automatic reversal, only in a "very limited class of cases,"' such as the complete denial of counsel, a biased decision maker,

racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. (*Neder* [*v. United States* (1999) 527 U.S. 1,] 8.)" (*People v. Mil* (2012) 53 Cal.4th 400, 410 (*Mil*).) As long as the defendant had counsel and was tried by an impartial adjudicator, "'"there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis."'" (*Neder*, *supra*, 527 U.S. at p. 8.)" (*Ibid.*) Instructional error involving multiple elements "will be deemed harmless only in unusual circumstances, such as where each element was undisputed, the defense was not prevented from contesting any of the omitted elements, and overwhelming evidence supports the omitted element." (*Id*. at p. 414.) The court in *Mil* determined that such instructional error is subject to harmless error analysis under the California constitution as well. (*Id*. at p. 415.)

Each appellant was represented by counsel and there is no claim the jury was not impartial, giving rise to the presumption that the instructional error here does not come within the narrow class of errors which are structural. We therefore determine whether the instructional error was harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at page 24.

As to whether a deadly or dangerous weapon was used in Cook's murder, we find the error harmless beyond a reasonable doubt. Overwhelming and uncontested evidence established that Cook was killed by blunt force through repeated blows to his head from an object or objects consistent with the pipes described by Doolan in her testimony. Each appellant's defense was misidentification rather than that a deadly weapon was not used. In closing argument, counsel for Ortiz conceded the crime was "an extraordinarily vicious and brutal beating." He argued that there was no testimony that Ortiz or anyone else had used the pipes to hit anyone. He pointed out that the pipes were not recovered and therefore there was no DNA evidence recovered from them. He also argued there was no evidence of what the weapon looked like. Counsel for Castro did not address the pipe issue in his closing argument. On this record, no rational factfinder could have concluded that the murder was committed without the use of a deadly weapon.

Appellants point out that the jury was instructed that defendants could be found guilty as aiders and abettors of the crime rather than the actual perpetrator. As we have noted, Doolan testified that Castro said that he had "'cracked [Cook] pretty hard.'" There was no eyewitness testimony as to which appellant struck Cook, or whether both did. Since the murder weapon or weapons were not recovered, there was no evidence linking appellants to their use. Ortiz's fingerprints on the window of an exterior door at Cook's house and palm print on the kitchen counter establish his presence at the murder scene but do not prove his personal use of a deadly weapon.

Under the evidence presented, the blow or blows that killed Cook could have been struck by Castro, by Ortiz, or by both of them. Castro's statement that he "'cracked [Cook] pretty hard'" established that he personally administered a fatal blow. But there is no such evidence as to Ortiz. We therefore shall uphold the section 12022, subdivision (b)(1) enhancement as to Castro, but must reverse it as to Ortiz.

II

Castro and Ortiz also challenge sufficiency of the evidence supporting the jury's finding that the crime was committed for the benefit of, at the direction of, or in association with a criminal street gang. (§ 186.22, subd. (b)(1).)

Section 186.22, subdivision (b)(1) provides for a sentence enhancement as to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 818.) The prosecution must prove that the members of the gang have individually or collectively engaged in a pattern of criminal gang activity. (§ 186.22, subd. (f).) Under section 186.22, subdivision (e), a "'pattern of criminal gang activity'" is defined as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the offenses [enumerated in subdivision (e)], provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred

9

within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons. . . ."

The basis of appellants' argument is that one of the two predicate gang crimes advanced by the prosecution did not qualify as a predicate offense under section 186.22, subdivision (e). Respondent concedes the point. At trial, the prosecution presented evidence that East Side Paramount gang member Erik Heredia was convicted of possession of a deadly or dangerous weapon in May 2010 under former section 12020, subdivision (a)(1). No evidence of Heredia's conduct which led to the conviction was introduced, only the record of conviction was presented. While some forms of possession of a deadly or dangerous weapon might have qualified under section 186.22,[4] respondent concedes that "there was insufficient evidence from which the jury could conclude that Heredia's conviction for 'possession of a dangerous or deadly weapon' qualified as a predicate gang offense."

We agree with this analysis. But that conclusion does not end our discussion. An error in instructing the jury on the criminal gang enhancement requires reversal of the gang enhancement unless the error is shown to be harmless beyond a reasonable doubt. (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1401 (*Bragg*), citing *People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324.)

The charged crime may serve as a predicate offense. (*Bragg, supra,* 161 Cal.App.4th at p. 1400.) In that case Bragg was convicted of three counts of attempted murder. The jury found that the offenses were committed for the benefit of or in association with a criminal street gang within the meaning of section 186.22, subdivision (b)(1). The jury instruction on the enhancement listed two predicate offenses, one of which (battery with serious bodily injury) was not a qualifying crime

---

[4]     Castro points out that section 186.22, subdivision (e) lists certain qualifying gun possession crimes, including possession of a firearm capable of being concealed, offender in possession of a firearm, carrying a concealed firearm, or carrying a loaded firearm. (§ 186.22, subd. (e)(23), (31-33).)

10

enumerated in section 186.22, subdivision (e). It was conceded on appeal that this was error. (*Bragg*, at p. 1400.)

The first predicate offense in *Bragg* was uncontested, and the court concluded that the jury had found commission of that offense true beyond a reasonable doubt. In addition, the jury's conviction of the defendant for the charged offenses established that the jury found them true beyond a reasonable doubt. The jury was instructed that the charged offenses qualified as predicate crimes within the meaning of section 186.22. On that record, the *Bragg* court concluded that the error in instructing the jury on the elements of a predicate offense which did not qualify under section 186.22 was harmless beyond a reasonable doubt. (*Bragg*, *supra*, 161 Cal.App.4th at p. 1401.)

Our case is similar. Castro argues that the standard instruction on the gang enhancement was not sufficient to advise the jury that it could consider Cook's murder as a predicate crime for the gang enhancement because "it did *not* list the present crime— murder—when it came to providing *the very definition*—and a tailored one, at that—of a 'pattern of criminal gang activity.'"

As modified, the version of CALCRIM No. 1401 given here informed the jury that "A pattern of criminal gang activity, as used here, means: [¶] 1. The conviction of any combination of two or more of the following crimes: assault with a deadly weapon and illegal weapon possession." But the instruction continued: "If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was commission of that crime and whether a pattern of criminal gang activity has been proved. [¶] You may not find that there was a pattern of criminal gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find that the allegation has not been proved."

Castro asserts that the jury could not have used the current murder charge as pattern evidence because of the wording of the instruction, and therefore argues we may not look to the present offense in considering the claim of error.

We disagree. The instruction clearly informed the jury that it could consider appellants' convictions for Cook's murder in determining whether a pattern of criminal gang activity had been proven beyond a reasonable doubt. The prosecutor did not identify the predicate offenses for the gang enhancement in his opening statement, closing argument, or rebuttal. He thus avoided confusing the jury by relying on the Heredia conviction to the exclusion of the present charge of murder. Similarly, in *Bragg*, the prosecutor did not argue that a pattern of gang activity could be established by conviction of the present offenses. The court reasoned: "However the prosecutor chose to argue the matter, the jury knew that it could consider the current offenses as a predicate offense under the statute." (*Bragg*, *supra*, 161 Cal.App.4th at p. 1402.) In addition, the *Bragg* court concluded that a unanimity instruction was not required because commission of predicate crimes falls within the "'continuous-course-of-conduct' exception to the rule requiring unanimity. [Citation.]" (*Ibid.*) As in *Bragg*, the jury in this case was instructed that the Cook murder was a qualifying predicate offense for imposition of the gang enhancement under section 186.22, as was the other uncontested predicate crime. The error in instructing the jury that the Heredia conviction was a qualifying offense was harmless beyond a reasonable doubt.

III

Ortiz claims the court's admonition to the jury to disregard a statement by the prosecution gang expert, Deputy Sheriff Kasey Woodruff, did not cure the prejudice, requiring reversal as a violation of his state and federal rights to due process and a fair trial. The argument is based on Deputy Woodruff's statement that Ortiz was "willing to . . . assault, shoot, kill for the gang." Ortiz argues that the statement was so prejudicial that he may raise the issue on appeal despite the failure of his defense counsel to move for mistrial.

12

A. *Trial Proceedings*

Deputy Woodruff testified about his experience and training regarding gangs, including hundreds of contacts with East Side Paramount gang members. He outlined the territory of the East Side Paramount gang, its membership, and its enemies. Deputy Woodruff testified that Cook's murder occurred near the gang's territory. He explained the concept of "putting in work" for a gang. According to Deputy Woodruff, the primary activities of the East Side Paramount gang "that I've seen over the years" includes narcotics offenses, weapons violations, attempted murder, and murder. He described common signs and symbols used by the gang in tattoos and graffiti.

Deputy Woodruff testified he knew Castro's name and moniker, but had no prior contact with him. He learned about Castro through the present case. He had one prior contact with Ortiz. Deputy Woodruff identified tattoos on the bodies of each appellant as associated with the East Side Paramount gang. In his opinion, Castro and Ortiz are members of that gang.

Based on hypothetical questions drawn from the evidence in the case, Deputy Woodruff opined that a beating murder committed by two members of the same street gang was for the benefit of the gang.[5]

During direct examination the prosecutor asked Deputy Woodruff his opinion as to whether Ortiz held any rank within the East Side Paramount gang. He answered: "From my experience and knowledge, . . . he is not, he is not low-level. He is somebody that's not afraid to put in the work. He is somebody that will, that's willing to, you know, assault, shoot, kill, for the gang." Counsel for Ortiz did not object at that time. Deputy Woodruff then was asked whether one of the appellants outranked the other within the gang. He said that in his opinion, Castro outranked Ortiz based on Castro's time in the neighborhood and in prison. Deputy Woodruff said he was familiar with Castro from the

---

[5]     The two hypotheticals asked Deputy Woodruff to assume that two members of the same street gang commit a crime together (the second hypothetical specified beating a man to death), near their territory, in the presence of a person not in their gang.

13

current murder case and from "intelligence."[6]  At that point, counsel for Castro asked to approach and pointed out that the witness had referred to Castro's prison record.  The judge said he had missed the statement because he was thinking about why counsel for Ortiz had not objected to the expert's testimony that Ortiz was willing to shoot or kill for the gang.  The court observed that this was character evidence under Evidence Code section 1101, and that there had been no objection.  The court offered to entertain an objection to the testimony about Ortiz, and to give a curative admonition.  Counsel for Ortiz objected and asked for the admonition.  The court said it was inclined to strike the statement that Ortiz was willing to shoot and kill for the gang.[7]

The court admonished the jury:  "There was a previous statement made by the witness in his opinion to 'a defendant would shoot and be prepared to shoot and kill for the gang.'  You are to disregard that statement and not consider it for any purpose whatsoever."  Counsel for Ortiz did not move for mistrial.

B.  *Forfeiture*

Respondent argues that Ortiz has forfeited the challenge to the sufficiency of the curative admonition given by the court, citing the general rule that "a defendant who receives a curative admonition, but who makes no other objection and seeks no other action, may not complain on appeal.  Defendant may not argue that the court should have granted a mistrial he did not request . . . ." (*People v. Chatman* (2006) 38 Cal.4th 344, 368 (*Chatman*).)  Ortiz acknowledges the rule, but claims that it does not apply in an exceptional case where ""'"the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions."'"" (*People v. Olivencia* (1988) 204 Cal.App.3d 1391, 1404, quoting *People v. Allen* (1978) 77 Cal.App.3d 924, 934-935.)  He distinguishes *Chatman*, *supra*, at page 368, on the ground that it involved spectator misconduct (blurting out comments) during the penalty, rather than guilt, phase

_____

[6]     Deputy Woodruff was not asked to explain what he meant by "intelligence."

[7]     Counsel for Castro stated that he did not want the reference to Castro's prison record stricken and did not want a curative admonition on the theory that this would draw more attention to the brief reference by the witness.

of a trial. He points out that the statement in this case was made during the guilt phase of trial by a law enforcement officer. In *People v. Hill* (1992) 3 Cal.4th 959, the court concluded that because a spectator "does not wear the same cloak of official authority as a prosecutor, most instances of spectator misconduct will likely be more easily curable than those of a prosecutor." (*Id*. at p. 1000, overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069.)

"'It is only in the exceptional case that "the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions." [Citation.]' [Citation.]" (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1429.) The California Supreme Court has found a timely admonition to the jury sufficient to cure any prejudice in situations involving even more inflammatory statements.

In *People v. Ledesma* (2006) 39 Cal.4th 641, a prosecution witness mentioned that the defendant had been on death row. In an effort to explain this reference, the defense counsel asked questions making it clear that the defendant's prior conviction on the same charges had been reversed on grounds that trial counsel had been ineffective. The Supreme Court found the trial court did not err in denying a motion for mistrial because there was no basis for concluding that the statement was incurably prejudicial. (*Id*. at pp. 682-683.)

In *People v. Avila* (2006) 38 Cal.4th 491, 573-574, the Supreme Court found the trial court did not abuse its discretion by denying a mistrial motion after a witness testified that Richard Avila, one of the three co-defendants, warned him to "[k]eep cool" because appellant Johnny Avila was crazy and would kill the witness. (*Id*. at p. 572.) The trial court instructed the jury that this statement could be considered for Richard Avila's state of mind (at Richard's request) but that they "'[could] not consider those statements for their truth or as against any other defendant in this case.'" (*Id*. at p. 573.) The Supreme Court presumed the jury followed this instruction. (*Id*. at p. 574.)

In *People v. Valdez* (2004) 32 Cal.4th 73, the court instructed a police officer to avoid revealing that he interviewed the defendant while the defendant was in custody. In response to the prosecutor's question about how the interview was conducted, the officer

15

said it was while the defendant was at Chino Institute. (*Id*. at p. 124.) Defense counsel's motion for a mistrial was denied because the court found no intentional misconduct. Defense counsel agreed there was no intentional misconduct. (*Id*. at p. 124, fn. 25.) The Court of Appeal held that the defendant forfeited a claim of prosecutorial misconduct based on this statement because although his counsel objected, he rejected the trial court's offer to admonish the jury. (*Id*. at pp. 124-125.) The court found the isolated reference to the Chino Institute was not so grave that a curative instruction would not have mitigated any possible prejudice to the defendant. (*Id*. at p. 125.)

Ortiz has failed to demonstrate that the statement by Deputy Woodruff was so inflammatory that the court's admonition could not mitigate any prejudice. The court promptly admonished the jury to disregard the statement. In the concluding instructions, the court gave CALCRIM No. 222, which in part reminded the jury, "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose." Furthermore, "absent some indication to the contrary, we assume a jury will abide by a trial court's admonitions and instructions. [Citation.] We conclude defendant forfeited this issue." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1336 [defense counsel failed to object to statements made by the prosecutor in closing argument, defendant claimed objection would have been futile].) The issue was not preserved for appeal.

In any event, even had it been preserved, we find no due process violation. Ortiz argues that the stricken statement that he was willing to shoot and kill for the gang violated his rights to due process under the federal and state constitutions. He reasons that the court's admonition could not have cured the harm because the evidence against him was weak, Deputy Woodruff's testimony was improper character evidence based on inadmissible hearsay, and the statement was highly inflammatory with only marginal relevance to the factual situation. He cites Woodruff's testimony that he had had contacts with hundreds of East Side Paramount gang members, including Ortiz himself in 2008. He also cites Deputy Woodruff's testimony about his experience investigating gangs during which he spoke to hundreds of self-admitted and documented gang members.

16

The record does not support Ortiz's assertion that Deputy Woodruff's testimony was based on inadmissible hearsay. The California Supreme Court recently clarified the principles governing testimony by a gang expert witness based on hearsay. An expert may testify about his general knowledge, but may not testify about case-specific facts about which he has no personal knowledge.[8] (*People v. Sanchez* (2016) 63 Cal.4th 665, 676-677 (*Sanchez*).) Hypotheticals based on case-specific facts for which there is independent competent evidence may be used to elicit an expert's opinions. (*Id.* at p. 677.) The *Sanchez* court determined that under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), if hearsay relied upon by an expert witness was testimonial and an exception did not apply, the defendant should be given the opportunity to cross-examine the declarant or the evidence should be excluded. (*Sanchez, supra*, at p. 685.) It concluded: "What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception."[9] (*Id.* at p. 686.)

No hearsay objection was raised during Deputy Woodruff's testimony by either defense counsel. Woodruff testified that both appellants are members of the East Side Paramount gang. The only specific basis for this opinion explored at trial was evidence of the appellants' tattoos, which Deputy Woodruff described as related to that gang. The *Sanchez* court expressly condoned the admission of an expert's opinion that a defendant is a gang member based on tattoos. (*Sanchez, supra*, 63 Cal.4th at p. 677.) The court admonished the jury to disregard Deputy Woodruff's case-specific testimony that Ortiz

---

[8]    The *Sanchez* court held that a gang expert may testify that a tattoo depicted in an authenticated photograph may be the basis for a gang expert's opinion that the presence of the tattoo, associated with a particular gang, shows that the person belongs to the gang. (*Sanchez, supra*, 63 Cal.4th at p. 677.)

[9]    The Supreme Court adopted a two-step analysis to determine the admissibility of out-of-court statements: 1) is the statement hearsay offered for the truth, which does not fall within a hearsay exception; and 2) if the statement is testimonial, its admission violates the right to confrontation unless a *Crawford* exception applies. (*Sanchez, supra*, 63 Cal.4th at pp. 680-681.)

was willing to shoot and kill for the gang. Unlike the gang expert in *Sanchez*, Deputy Woodruff did not say that his testimony was based on material which may violate the right to confrontation under *Crawford*, *supra*, 541 U.S. 36, including police reports, field identification cards, or STEP notices.[10] (See *Sanchez*, *supra*, at pp. 694-698.)

The record does not establish that Deputy Woodruff relied on inadmissible hearsay for his testimony. The jury was admonished to disregard his statement concerning Ortiz's willingness to shoot and kill for the gang. Ortiz points out that the trial court "'has discretion "to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein." [Citation.]' [Citation.]" (*People v. Bell* (2007) 40 Cal.4th 582, 608.) We note that the trial court concluded that the statement about Ortiz's willingness to shoot and kill for the gang violated Evidence Code section 1101's prohibition on the admission of character evidence. Counsel for Ortiz did not state the basis for his objection in response to the court's statement. He did not cite Evidence Code section 352, which confers discretion on the trial court to exclude evidence which is more prejudicial than probative. Failure to make a specific objection on the ground asserted on appeal makes that ground not cognizable. (*People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293; *People v. Partida* (2005) 37 Cal.4th 428, 434-435.)

As we have concluded, the court's prompt admonition was sufficient to mitigate any prejudice arising from Deputy Woodruff's statement. There was substantial evidence of Ortiz's guilt. We infer from the guilty verdicts that the jury credited Doolan's testimony. Witnesses Chin and Fowler gave testimony placing Ortiz at Cook's house on the afternoon of the murder. The medical examiner testified that a pipe such as the one

---

[10]     STEP is the acronym for California Street Terrorism Enforcement and Prevention Act. (§ 186.20.) STEP notices are issued by police officers to individuals associating with known gang members. The portion retained by the officer in *People v. Sanchez*, *supra*, 63 Cal.4th at page 696 included the defendant's biographical information, whom he was with, and statements he made. The Supreme Court noted that the officer swore to the accuracy of the representations in the notice, and concluded it was testimonial within the meaning of *Crawford*, *supra*, 541 U.S. 36. (*Sanchez*, at pp. 696-697.)

18

Doolan saw Ortiz holding during the argument with Cook was consistent with Cook's injuries.

"[A]dmission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida, supra,* 37 Cal.4th at p. 439.) We conclude that the court's admonition was sufficient to cure any prejudice arising from Deputy Woodruff's statement about Ortiz. Ortiz received a fair trial. His federal and state constitutional rights were not violated.

IV

Ortiz argues the trial court erred by imposing five one-year enhancements for five prior prison terms he served.[11] (§ 667.5.) He claims that due to revocation of his parole, the prison term for prior 1 overlapped with prior 2, prior 2 overlapped with priors 3, 4, and 5, prior 3 overlapped with priors 4 and 5, and prior 4 overlapped with prior 5. He concludes that he served only a single period of incarceration within the meaning of section 667.5, subdivision (g), and therefore imposition of five enhancements was error.

Section 667.5, subdivision (b) provides for imposition of an additional one-year term for each prior separate prison term. Subdivision (g) of section 667.5 defines a "prior separate prison term" as "a continuous completed period of prison incarceration imposed for the particular offense alone or in combination with concurrent or consecutive sentences for other crimes, *including any reimprisonment on revocation of parole which is not accompanied by a new commitment to prison*, and including any reimprisonment after an escape from incarceration." (Italics added.) As respondent asserts, Ortiz's argument ignores the italicized language of section 667.5, subdivision (g). Punishment with the additional enhancement provided for in section 667.5, subdivision (b) is

---

[11] Prior 1 (case No. TA073502) was a March 12, 2004 conviction for violation of Vehicle Code section 10851. Prior 2 (case No. VA091336) was a September 26, 2005 conviction for a violation of Vehicle Code section 10851. Prior 3 (case No. TA087919) was a December 4, 2006 violation of Health and Safety Code section 11370.1, subdivision (a). Prior 4 (case No. TA097607) was a June 22, 2009 conviction for violation of section 245, subdivision (a)(1). Prior 5 (case No. VA115635) was an August 26, 2010 conviction for violation of Vehicle Code section 2800.2.

19

appropriate where the defendant failed to remain free of custody by committing new offenses of sufficient severity to warrant parole revocation and a return to custody. (*In re Preston* (2009) 176 Cal.App.4th 1109, 1117; *In re Kelly* (1983) 33 Cal.3d 267, 270-271, partially overruled on another ground in *People v. Langston* (2004) 33 Cal.4th 1237, 1245-1246.)

The trial court properly imposed the five separate one-year enhancements.

V

Originally, both appellants challenged the court's calculation of presentence custody credits. As we noted above, Ortiz sought and obtained a correction in the trial court and has withdrawn this issue on appeal. Castro did not seek relief in the trial court. He was arrested on July 2, 2013. He remained in custody until sentenced on February 20, 2015, a period of 599 days. The trial court gave Castro credit for 581 days. Respondent concedes that Castro was entitled to an additional 18 days of credit, for a total of 599 days. We agree with this calculation and direct the trial court to amend the abstract of judgment to reflect that Castro is credited with 599 days of presentence custody credit.

VI

The parties agree that at the sentencing hearing, the trial court said that it was imposing a restitution fine of $7,812.50 on Ortiz, but said nothing about whether it was joint or several. Moments later, Castro was sentenced. The trial court said "You're to make restitution to the victim in the amount of—that will be joint and several with your co-defendant—$7,812.50." The abstracts of judgment state that the fine is $7182.50 (Castro) and $7,812.50 (Ortiz), but do not reflect that the award is joint and several.

We may correct a clerical error in an abstract of judgment. Where there is an inconsistency between the court's oral order and the minute or abstract of judgment, the oral order controls. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.)

We direct the trial court to correct the abstract of judgment to reflect the correct amount of restitution fine ($7,812.50) and that it is imposed jointly and severally.

20

DISPOSITION

The enhancement for personal use of a deadly weapon (§ 12022, subd. (b)(1)) is reversed as to Ortiz but affirmed as to Castro. The trial court is directed to correct the abstracts of judgment for each appellant to reflect the correct amount of restitution fine and that it is imposed jointly and severally. It also is directed to correct the amount of presentence custody credit awarded Castro to 599 days. As modified, the judgments are affirmed in all other respects. The trial court is to serve copies of the amended abstracts of judgment on the Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**


                                                            EPSTEIN, P. J.


We concur:



MANELLA, J.



COLLINS, J.